# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT

U.S. COURT OF APPEALS
RECEIVED
10TH CIRCUIT
2010 OCT 26 AM 9: 06

FILED
United States Court of Appeals
Tenth Circuit

OCT 2 6 2010

ELISABETH A. SHUMAKER
Clerk

Plaintiff/Petitioner - Appellant,

Case No. 10 1428

v.

Defendant/Respondent - Appellee.

Appellant/Petitioner's ~~Opening Brief~~ MOTION FOR EMERGENCY STAY OF PUBLIC TRUSTEE SALE NO. 1772- 2010 PENDING HEARING ON TRO AND PRELIMINARY INJUNCTION

## NOTICE AND INSTRUCTIONS

If you proceed on appeal pro se, the court will accept a properly completed Form A-12 in lieu of a formal brief. This form is intended to guide you in presenting your appellate issues and arguments to the court. If you need more space, additional pages may be attached. A short statement of each issue presented for review should precede your argument. Citations to legal authority may also be included. This brief should fully set forth all of the arguments that you wish the court to consider in connection with this case.

New issues raised for the first time on appeal generally will not be considered. An appeal is not a retrial but rather a review of the proceedings in the district court. A copy of the completed form must be served on all opposing counsel and on all unrepresented parties and a proper certificate of service furnished to this court. A form certificate is attached.

## APPELLANT/PETITIONER'S OPENING BRIEF

**1. Statement of the Case.** (This should be a <u>brief</u> summary of the proceedings in the district court.)

DISTRICT COURT DENIED A MOTION FOR TRO AND PRELIMINARY INJUNCTION, based on Appellees violated Colorado foreclosure STATUTES, a settlement Agreement requiring Appellees to File a valid foreclosure including proving that Appellee AURORA LOAN SERVICES LLC WAS OWNER AND HOLDER OF THE NOTE (securitized) AND DEED OF TRUST AS ALLEGED IN THE RULE 120 PROCEEDING. Appellees have produced only a defective Allonge, not a part of the Note AND WITH NO VALID SIGNATORY. Appellees produced another purported assignment from MERS that also endorsed (purportedly) the same note in a robo-signed clearly defective attempt to manufacture a chein of

**2. Statement of Facts Relevant to the Issues Presented for Review.** title That does not exist.

Appellees are participants in the securitization FORECLOSURE MORASS AND HAVE NOT SHOWN STANDING AS A REAL PARTY IN INTEREST TO FORECLOSE.

DEFENDANTS BREACHED THE SETTLEMENT AGREEMENT WHICH MOST IMPORTANTL REQUIRED THEM TO SHOW OWNERSHIP

The chein of title has defective endorsements from "Trustees" of unidentified TRUSTS. The ALLONGE TO AURORA LOAN SERVICES WAS H INDICIA OF AUTHORITY of the signor and NO FORMALITIES AND "ALS" REFERS TO A DIFFERENT NOTE NUMBER, ALS Also Relies oa an assignment of the Note by MERS (MORTGAGE ELECTRONIC REGISTRATION SYSTEM). Not Even Appellees contend that MERS HAD RIGHTS IN The Note

The DISTRICT COURT ASSUMED A FACT NOT IN EVIDENCE AND NOT correct That Colorado Courts by a Rule 120 Action had ruled against Appellant. THIS IS NOT THE FACT, IN Appellee's Previous defective foreclosure attempt The Rule 120 COURT SAID THAT RULE 120 IS limited in Scope AND THAT APPELLANT MUST BRING A SEPARATE ACTION. THIS IS THE RULE UNDER <u>PLYMOUTH CAPITAL Co. INC, v. DISTRICT COURT OF ELBERT COUNTY, 955 P. 2d 1014 (Colo. 1998)</u>

KNOWING FROM PAST ACTION THAT Appellee would REMOVE to FEDERAL COURT, APPELLANT BROUGHT THE SEPARATE ACTION in 1:10-cv-01936. DISTRICT COURT IGNORED AND FAILED TO CITE PLYMOUTH, SUPRA and concluded that Appellant was REHASHING RESOLVED ISSUES AND ISSUE IGNORE Appellee Breaches of Settlement Agreement

3. **Statement of Issues.**

a. **First Issue:** COURT ERRED BY NOT PROVIDING PROVIDING THE
SEPARATE ACTION MANDATED BY _PLYMOUTH_, SUPRA
OR STAYING THE ACTION PENDING A STATE RULING ON A SEPARATE
ACTION

**Argument and Authorities:**

PLYMOUTH, supra, holds that Rule 120 is limited in scope. More
complex issues must be brought in a separate action. Avo relies
primarily on
representations
by the lender

b. **Second Issue:** There is substantial likelihood that
appellant will prevail AT A MINIMUM ON THE ISSUE OF
ALS¹ Misrepresentations to Rule 120 Court that it was owned
AND THAT IT IS A REAL PARTY IN INTEREST with standing to foreclose,
**Argument and Authorities:**

The muddled endorsements and assignments simply do not give them
Appellants the Required rights.

C. THIRD ISSUE

COURT FOUND INCORRECTLY THAT MOTION WAS NOT VERIFIED EVEN
THOUGH IT STATED CRCP IT WAS VERIFIED (COURT knew that Plaintiff was
attorney in good standing in Colorado but had not practiced law in over 20 years.
COURT FOUND REQUIREMENT OF SERVICE FOR EX PARTE RELIEF WAS
NOT MET, BUT APPELLANT FILED CERTIFICATE OF SERVICE AND NOTIFIED
DEFENDANTS (APPELLEES), ENTERED APPEARANCES
                              who even

IF THERE WAS FAILURE TO VERIFY AN "EX PARTE VERIFIED MOTION", APPELLANT
CURED IT IN HIS MOTION FOR RECONSIDERATION.

**4. Do you think the district court applied the wrong law? If so, what law do you want applied?** Yes. Plymouth case to evaluate ACS' rights in a separate action

**5. Did the district court incorrectly decide the facts? If so, what facts?**

Court decided and admitted assuming facts not in evidence and facts contrary to Appellant such as whether or not Appellees complied with the settlement agreement. Also incorrectly decided appellant's likelihood of success on merits of foreclosure

**6. Did the district court fail to consider important grounds for relief? If so, what grounds?**

Lack of the separate proceeding mandated by Plymouth and defective endorsements, allonge and assignments

**7. Do you feel that there are any other reasons why the district court's judgment was wrong? If so, what?**

Court's conclusion of financial hardship on Appellees is unfounded.
Court's conclusion that "some lender" has rights, does not entitle Appellees to foreclose.
Court finding on reconsideration that appeal would be frivolous is completely unjustified

**8. What action do you want this court to take in your case?**

Stay foreclosure sale 1772-2010 pending preliminary injunction hearing in the District Court

**9. Do you think the court should hear oral argument in this case? If so, why?**

Yes. Many "robo-signer" parties attempted to manufacture a non existent chain of title which should be examined

_____
10-26-2010
Date

_____
Percy L Coddell
Signature

SEE ATTACHED SUPPLEMENT

## *MOTION AND SUPPORTING AUTHORITY*
### *FOR EMERGENCY STAY OF PUBLIC TRUSTEE SALE NO:1772-2010 PENDING HEARING ON TRO AND PRELIMINARY INJUNCTION*

Randy S. Goldenhersh, plaintiff, pro se, provides the following additionaL Emergency Verified Motion and Supporting Authority for Ex Parte Temporary Restraining Order and Preliminary Injunction of Arapahoe County Public Trustee Sale No. 1772-2010 of his residence for 22 years scheduled for October 27, 2010.

Plaintiff regrets that he is required to ask this Circuit Court ask for emergency injunctive relief. The events leading to this necessity were because the Bankruptcy Court Case No: 10-30897 , in a response to ALS' motion for relief from stay found that while plaintiff's issues may have merit that they were not within its purview Further that court later decided that even though Defendant Aurora Loan Services LLC , failure to notify the second lienholder, as required, more than 30 days had lapsed since ALS' filing of their motion ,albeit defective, so that ALS was nevertheless relieved from the 30 day stay. On October 22, 2010 Plaintiff then filed an emergency motion for a TRO with Arapahoe County District Court in an attempt to have the opportunity for the separate action outside the Colorado Rule 120 hearing as contemplated by the *Plymouth Case, infra. And incorrectly assumed to have occurred by the District Court.* That court has not yet been able to review or decide the motion. Defendants who were served and entered an appearance will be likely to act to delay a TRO and remove any such action to federal court based on their previous acts regarding this matter in order to delay any hearing beyond the foreclosure date of October 27, 2010. The Defendants have entered appearances in this action 10-cv 1428 and will receive electronic notice.

### SUMMARY

Defendant's attempt to foreclose on plaintiff's residence is based on defective documents,

and breaches of Colorado foreclosure laws and CRCP Rule 120. Defendants breached these requirements by failing to prove that ALS is owner and holder of the Note and Deed of Trust with standing and a real party in interest to foreclose. Defendants violated these requirements and the law and do not have valid endorsements of the Note or assignments of the Deed of Trust to ALS, despite Defendants misrepresentations to plaintiff, to the Public Trustee, and Rule 120 Court. If this Court does not grant an emergency TRO, and subsequent hearing, no court, will have substantively examined the defective, "robo-signed" and worse, manufactured documents by which defendant will have managed to get a wrongful foreclosure sale

Plaintiff believes ex parte relief is essential because the sale is imminent and because when a prior temporary restraining order was issued by the Arapahoe County District Court restraining a previous defective foreclosure attempt, defendant deliberately failed to cooperate or even respond or communicate with the Court or plaintiff to appear at a hearing on the TRO. Plaintiff reasonably believes that such an attempt will be futile and that Defendant will act so as to prevent any hearing before the schedule sale date of October 27, 2010.

In an extreme example of what has recently come to light as widespread foreclosure fraud plaintiff is being been subjected to a foreclosure attempt based on defective endorsements and assignments of a certain note ("Note") and deed of trust ("DOT"). These include a defective endorsement on a separate page ("Allonge"). For easy reference this page is excerpted at Exhibit 1. All of the exhibits to this motion are in documents filed in Case 1:10-cv-01936 or 1:10-cv-00407. This Allonge was signed by a purported trustee for an unidentified entity. For easy reference the back page of the Note containing the other endorsements is excerpted at Exhibit 2.

In a further defective attempt to manufacture a chain of title defendant also arranged for a "robo-signed" assignment of the DOT from Mortgage Electronic Registration Systems (MERS) created and recorded in December 2009 which also includes a startling endorsement of the Note from MERS to Defendant in Exhibit 3. Even Defendant does

not contend that MERS ever had rights in the Note and MERS had no authority to assign the DOT.

Defendant through its attorneys filed a verified motion (Exhibit 4) to the Rule 120 Court falsely swearing that Defendant 'is owner and holder' so as to appear to be a real party in interest in the Note and Deed of Trust. Exhibits 5 and 6.

Defendant knew, or should have known, that they relied on documents which are defective at best. Defendant failed to prove that it is owner, holder or a real party in interest with standing in this foreclosure attempt.

### ENTITIES, JURISDICTION AND VENUE

Randy S. Goldenhersh ("plaintiff") is an individual who owns and has resided for 22 years at 6500 E. Prentice Avenue (the "Property."). Plaintiff, who filed for Chapter 7 bankruptcy has rights because of his homestead interest in his residence and the actual or constructive abandonment of the claims against ALS.

Defendant Aurora Loan Service, LLC ("ALS" or defendant) is a Delaware LLC whose principal place of business is 10350 Park Meadows Drive, Littleton, Arapahoe County, Colorado. ALS is not named or identified in the Note or Deed of Trust. ALS is the most recent of the entities which claimed the right to receive loan payments.

Defendant purported to exercise a power of sale under a note ("Note") and deed of trust "Deed of Trust" both dated July 14, 2006. The Note and Deed of Trust identified LoanCity as the lender.

Mortgage Electronic Registration Systems, Inc., ("MERS") although not a foreclosing entity or named defendant, was identified in the Deed of Trust ("DOT") as " beneficiary" under the security instrument…". MERS in November 2009 recorded a purported endorsement not only of the DOT but also the Note (in which it never had rights) to ALS.

Defendants made unsupported misleading representations to plaintiff, the Public Trustee in their Notice of Election and Demand ("NED") and falsely swore in their Verified Motion to the Rule 120 Court that ALS was "owner and holder" with standing to foreclose.

Ana Marie Peters-Ruddick is Public Trustee of Arapahoe County, Colorado is a nominal defendant in her capacity to perform ministerial actions related to foreclosures (hereinafter referred to as the "Public Trustee")

The Court has jurisdiction and venue is proper because the parties and Property are located in or do business in Arapahoe County, Colorado.

## THE REQUIREMENTS FOR INJUNCTIVE RELIEF ARE SATISFIED

 The facts establish the requisites for injunctive relief: irreparable harm to plaintiff, probable success on the merits, lack of substantial harm to Defendants, benefit to the public interest, and lack of adequate remedy at law.  Defendant attempts to rely on defective including "robo-signed" documents and does not have evidence that it is a real party in interest with standing to foreclose under Colorado law pertaining to foreclosure.  The requirements for a preliminary injunction are: real, immediate irreparable harm to plaintiff, no plain speedy adequate remedy at law, service of  the public interest,  equities favor injunctive relief, the status quo will be maintained pending trial on the merits, and a substantial probability that the moving party will prevail on the merits. *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1317-18 (D.C. Cir. 1998).

### Irreparable Harm

There will be real, immediate, irreparable harm to plaintiff pending a final determination because absent a preliminary injunction plaintiff will unjustly and without adequate procedural protections afforded by law, lose in foreclosure his unique home and residence

for the past 22 years at 6500 E. Prentice Ave, Greenwood Village, Colorado if the Public Trustee foreclosure sale scheduled for October 27, 2010 proceeds. The harm is clearly irreparable. The legal doctrine regarding the uniqueness of a parcel of property is axiomatic.

### No Speedy Adequate Remedy at Law

There is no plain speedy adequate remedy at law to resolve the issues of this case. These include: Defendants' false and misleading statements to the Public Trustee and Rule 120 Court to obscure defects in the chain of title and violation of Colorado foreclosure law. These issues involve the acts of a number of individuals and purported entities involved in the endorsing and assigning of faulty documents to appear to create a chain of title and interest leading to Defendant. The trial of these issues could not be resolved during the statutorily limited inquiry of the Public Trustee and Rule 120 hearing and the short time frame for public trustee foreclosure.

A Rule 120 proceeding authorizing a sale as occurred here does not to prevent the property owner from bringing a separate proceeding regarding the validity of such a determination of rights. In fact such issues that go behind the face of the documents should be brought in a separate proceeding. *Plymouth Capital Co., Inc. v. District Court of Elbert County, 955 P.2d 1014 (Colo. 1998).* This critical case was ignored and not even cited by the District Court.

In fact in Defendant's prior defective foreclosure attempt plaintiff raised similar issues about defendant's lack of documentation. That Rule 120 Court in issuing the order authorizing sale noted that plaintiff should bring such claims in a separate action. Exhibit 8. Plaintiff did so. That first foreclosure attempt was subsequently withdrawn and the separate action dismissed with prejudice pursuant to a settlement agreement which required defendant to start a new foreclosure with a valid chain of interest.

### Injunction Serves the Public Interest

An injunction serves the public interest since the pubic interest, foreclosure law, and the consumer laws invoked by plaintiff promote homeownership and fair treatment of individual consumers such as plaintiff from improper residential foreclosure, lending and collection practices and the only recently publicized widespread lender foreclosure factory "robo-signer" and other abuses to which plaintiff and similarly situated parties have been subjected.

### The Equities Favor Injunctive Relief

The equities favor injunctive relief in this case which pit Defendants' vast resources comprised of an unresponsive apparent foreclosure factory, foreclosure factory and its attorneys and agents which have demonstrated in thousands of foreclosure cases in Colorado alone, a widespread disregard of the legal rights of plaintiff and others similarly situated who are poorly situated to evaluate and contest Defendants' actions.

### Injunction Preserves the Status Quo

The injunction will preserve the status quo pending a trial on the merits. The value of the residence as established by the Arapahoe County Assessor at $1,315,000 substantially exceeds the claim of alleged debt and interest of about $1Million. Exhibit 7. Therefore, the residence is more than adequate security without a bond if Defendants were to prevail on the right to foreclose. Since foreclosure sales are held weekly there is no measurable risk to defendant if it prevails in a hearing on whether the TRO should remain after its issuance or at a hearing on a preliminary injunction.

### THERE IS A SUBSTANTIAL PROBABILITY THAT PLAINTIFF WILL PREVAIL

Although other issues raised by plaintiff are complex, there is a substantial probability that plaintiff will prevail on the defective foreclosure. There is clear evidence that the scheduled Public Trustee Sale would be defective because it was based on Defendant's

misrepresentations. Defendants failed to provide the required valid endorsements and assignments to support Defendants' allegation that ALS is owner, holder of the Note and Deed of Trust and a real party in interest with standing to foreclose or that it would have good and merchantable title afterwards. The Allonge and robo document from MERS do not suffice.

**Defendants Misrepresented Defective Endorsements as Creating Rights in ALS**

No valid endorsement has been provided that evidences ALS to be a real party in interest with standing.

ALS lacks standing as a real party in interest with the right to initiate foreclosure and is an abuse of the Colorado Rule 120 foreclosure process. The real party in interest requirement is imposed by CRCP 17(a) (1) which states that "Every action shall be prosecuted in the name of the real party in interest." The real party in interest is the party with the right to sue or enforce a claim under the applicable substantive law. See, e.g., *U-Haul Int'l Inc. v. Jartran, Inc.*, 793 F. 2d 1034, 1038(9th Cir. 1986).

Defendants rely on defective endorsements and a manufactured defective endorsement on a separate page ("Allonge") purportedly assigning rights to ALS. Defendants use these to represent to the Public Trustee, the Rule 120 Court and plaintiff that ALS is owner, holder, and a real party in interest.

There is no reference to ALS anywhere in the original Note and Deed of Trust. ALS appears only in the last several months in two "transfers." One is the "Allonge", typed on a separate page despite availability of nearly an entire page on the Note itself, which has only two previous small stamped endorsements. The other is the startling "robo-signed" transfer of the Note from MERS which even defendant does not claim to have an interest in the Note.

The Allonge fails as an endorsement. It does not to meet the essential requirement that an allonge be on the note itself if there is any space at all *See Shepherd Mall St. Bank v. Johnson, 603 P. 2d 1115, 1118 (Okla. 1979); Tallahassee Bank & Trust Company v. Raines, 187 S.E. 2d 320, 321 (Ga. App. 1972)..* In what seems a disingenuous attempt to justify a separate sheet of paper, the typing and spacing of Allonge as large as possible, but these efforts do not work. Even the oversized Allonge would fit on the Note. A supporting Colorado case noted that a two page allonge would be physically impossible to place on two small checks, implying that if there had been room the allonge should have been on the note. *Lamson v. Commercial Credit Corporation,* 931 P.2d 966 (Colo.1975)

In another obvious fatal defect the Allonge refers to a "Note Number 0021706007" which is completely different from the number printed on the Note itself and the Deed of Trust both of which refer to "Note: 1001894811."

The Allonge is signed illegibly by an unidentified individual purporting to be acting for Deutsche Bank Americas. The signer's title which is hand printed and suggests that her title was an afterthought since it includes an unexplained hand written "scratch out" is shown as "Limited Signing Officer". There is no legible typed or printed name. There are no indicia of authority. There are no supporting documents evidencing a delegation, no notarization even as to the identity of the individual, and no corporate formalities whatsoever in support. In the unusual circumstances where an allonge is permitted it is essential to physically affix the allonge and use precise formalities such as delegation of authority and notarization to link the allonge to the note. See *In RE Barry Weisband, Case No. 4:09-bk-05175-EWH, US Bankruptcy Ct., Dist of Ariz., March 29, 2010.*

In an apparent attempt to gloss over the many defects in the chain of title, Defendants' Allonge use three lines to describe the assigning trustee ( again with no indication of any trust) and includes yet another unidentified entity, Bankers Trust.

The apparent first endorsement on the Note is from LoanCity, the original purported, now bankrupt defunct lender to Residential Funding Corporation ("RFC").

The second defective endorsement is from RFC to" Deutsche Bank Americas as Trustee" ("DB").    There is no indication as to what, if any, entity is the assignee for which DB is trustee.

Defendant, expert in foreclosure, knew, or should have known, its actions were improper. Defendant manipulated the statutorily limited inquiry of Public Trustee and Rule 120 proceedings by presenting documents which negligently or intentionally attempt to gloss over defects in the chain of title required by law and which admit to be necessary.

Defendants contend and the District Court assumed that a certain settlement agreement "Settlement Agreement" and resulting stipulated dismissal with prejudice of plaintiff's claims in a previous defective foreclosure, that was supposed to resolve Defendants' previous defective foreclosure attempt with a valid new one, and the subsequent US District Court denial of a TRO or preliminary injunction preclude this action and a temporary restraining order or preliminary injunction. *Civil Action No. 10-cv-01936 United States District Court for the District of Colorado.*    This is incorrect.

In defendant's First Foreclosure Attempt to based on faulty documents, plaintiff raised the issue of lack of chain of title in the Rule 120 proceeding.  Notwithstanding plaintiff's issues, that first Rule 120 Court issued an order authorizing sale but also noted the limited scope of a Rule 120 review and the right of plaintiff to pursue such claims in a separate proceeding. Exhibit 8.  This is consistent with the *Plymouth Capital, supra.,* limiting the scope of Rule 120 hearings

Plaintiff was attempting in to follow the direction in that state court order to bring a separate action in the U.S. District Court knowing that defendant would seek removal from state court as it had in the first action.

The U.S. District Court, however, predicated its denial of injunctive relief based on the incorrect assumption that Colorado courts had already fully examined plaintiff's position and ruled against plaintiff. The U.S. District Court declined to revisit or reverse what it assumed was a binding state court determination. Plaintiff has never had hearing on the issues he raises. Plaintiff asks this Court to provide for the hearing for the separate action contemplated by *Plymouth, supra.*

Failure to do so will result in a sale with absolutely no opportunity for plaintiff to have a hearing on the serious deficiencies in defendant's documents and position.

As to the Settlement Agreement, Defendants breached virtually every one of their obligations in The Settlement Agreement. The most important required Defendant to dismiss the previous foreclosure and proceed with a new valid foreclosure. Nothing in the Settlement Agreement allowed Defendants to circumvent the law by proceeding to foreclose on defective, if not fraudulent documents in an attempt to circumvent the law.

**Violation of Due Process Clause of the Colorado Constitution**

There will be a denial of due process under Article 25 of the Colorado constitution absent a full judicial hearing on the merits because Public Trustee foreclosure and Rule 120 hearings are by statute and Colorado case law limited inquiries and require a separate legal action to address plaintiff's issues. The short time frame between the NED and the Public Trustee sale do not allow resolution of issues like plaintiff's absent such a hearing or trial on the merits.

Therefore, Defendants lacking the necessary criteria, but attempting to railroad plaintiff into foreclosure had nothing to lose and the chance to put this plaintiff and thousand of others, at significantly greater disadvantage in presenting the issues of the underlying foreclosure case since Colorado statutes provide no penalty for abuse of the foreclosure process.

Plaintiff's right under Colorado law to bring a separate action for relief separate from the Rule 120 hearing does not remedy the Colorado due process violation created by Defendants' defective and disingenuous foreclosure attempt. Because of the short time frame of the non- judicial foreclosure, such separate action forces plaintiff to seek injunctive relief, which has significant additional requirements including showing of benefit to the public interest, substantial probability of success, and a requirement for security.

THERFORE, based on Defendants' lack of valid documents the foreclosure process has been so tainted, that plaintiff requests this Court to enter an ex parte temporary restraining order prohibiting Public Trustee Sale Number 1772-2010 any prohibiting Defendants from foreclosure on the Note and Deed of Trust pending a hearing on whether the TRO should remain in place or a preliminary injunction hearing and further requests, as a *pro se* plaintiff an opportunity to be heard to cure any technical or information defects in pleading.

RANDY S. GOLDENHERSH , *pro se*

Randy S. Goldenhersh

6500 E. Prentice Ave.
Greenwood Village, CO 80111
Telephone: (303) 324 1868

Submitted October 26, 2010
Defendant's address:

6500 E. Prentice Avenue
Greenwood Village, CO 80111

## CERTIFICATE OF SERVICE

I hereby certify that on ___10/26/2010___ I served a copy of
                              (date)

the Appellant/Petitioner's Opening Brief to _____

___DFEUOANTS___, at ___V/A ECF___
(Opposing Party or Attorney)

_____, the last known address/email

address, by _____.
             (state method of service)


___10/26/2010___              _____
Date                          Signature

$E \times H I A I T \ 1$

NOTE ALLONGE
================================

For purposes of further endorsement of the following described
Note, this Allonge is affixed and becomes a permanent part of
said Note:

Loan #. 0021706007

Executing Mortgagor: Randy S. Goldenhersh

Original Mortgage Amount:    $910,000.00

Original Lender· Loancity, a California Corporation

Loan Date: July 14, 2006

Property Address: 6500 East Prentice Avenue, Greenwood Village,
CO 80111

Without recourse pay to the order of: Aurora Loan Services LLC

By·  _____

Name  Vickie Via

Title.  Limited Signing Officer

Company   Deutsche Bank Trust Company Americas as Trustee FKA
Bankers Trust Company, as Trustee by Residential Funding Company,
LLC FKA Residential Funding Corporation, it's Attorney in Fact

$E x H I B I T$ 2

PAY TO THE ORDER OF
**RESIDENTIAL FUNDING COMPANY, LLC**
WITHOUT RECOURSE
This ___ day of JUL, 200 L

LoanCity
A CALIFORNIA CORPORATION

X _____
Meredith Brannon
Senior Loan Closer

PAY TO THE ORDER OF
Deutsche Bank Trust Company Americas as Trustee
WITHOUT RECOURSE
Residential Funding Company, LLC

BY _____
Judy Faber, Vice President

EXHIBIT 3

Arapahoe County Clerk & Recorder, Nancy A. Doty
Reception #: 89132599
Receipt #: 5522008          Recording Fee: $5.00
Pages Recorded: 1
Date Recorded: 12/8/2009 3:17:09 PM
[ELECTRONICALLY FILED]

Arapahoe, Colorado FC
SELLER'S SERVICING #:0021706007 "GOLDENHERSH"

## CORPORATE ASSIGNMENT OF DEED OF TRUST

MERS #: 100058310000809766  VRU #: 1-888-679-6377

Date of Assignment: December 2nd, 2009
Assignor: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR LOANCITY, A CALIFORNIA CORPORATION. IT'S SUCCESSORS AND ASSIGNS at 3300 S.W. 34TH AVENUE, SUITE 101, OCALA, FL 34474
Assignee: AURORA LOAN SERVICES LLC at 2617 COLLEGE PARK, SCOTTSBLUFF, NE 69361

Executed By: RANDY S. GOLDENHERSH To: MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC AS NOMINEE FOR LOANCITY, A CALIFORNIA CORPORATION
Dated: 07/14/2006 Recorded: 07/21/2006 as Instrument No.: B6105611 In Arapahoe, Colorado

Assessor's/Tax ID No. 43409746

Property Address: 6500 EAST PRENTICE AVENUE, GREENWOOD VILLAGE, CO 80111

   KNOW ALL MEN BY THESE PRESENTS that in consideration of the sum of TEN and NO/100ths DOLLARS and other good and valuable consideration, paid to the above named Assignor, the receipt and sufficiency of which is hereby acknowledged, said Assignor hereby assigns unto the above-named Assignee, the said Deed of Trust together with the Note or other evidence of indebtedness (the "Note"), said Note having an original principal sum of $910,000.00 with interest, secured thereby, together with all moneys now owing or that may hereafter become due or owing in respect thereof, and the full benefit of all the powers and of all the covenants and provisos therein contained, and the said Assignor hereby grants and conveys unto the said Assignee, the Assignor's beneficial interest under the Deed of Trust.

   TO HAVE AND TO HOLD the said Deed of Trust and Note, and also the said property unto the said Assignee forever, subject to the terms contained in said Deed of Trust and Note. IN WITNESS WHEREOF, the assignor has executed these presents the day and year first above written:

MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR LOANCITY, A CALIFORNIA CORPORATION.
IT'S SUCCESSORS AND ASSIGNS
On December 2nd, 2009

By: _____
THEODORE SCHULTZ, Vice-President

STATE OF Nebraska
COUNTY OF Scotts Bluff

On December 2nd, 2009, before me, LINDA D. PARKS, a Notary Public in and for Scotts Bluff in the State of Nebraska, personally appeared THEODORE SCHULTZ, Vice-President of MORTGAGE ELECTRONIC REGISTRATION SYSTEMS, INC. AS NOMINEE FOR LOANCITY, A CALIFORNIA CORPORATION., personally known to me (or proved to me on the basis of satisfactory evidence) to be the person(s) whose name(s) is/are subscribed to the within instrument and acknowledged to me that he/she/they executed the same in his/her/their authorized capacity, and that by his/her/their signature on the instrument the person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

WITNESS my hand and official seal,

_____
LINDA D. PARKS
Notary Expires: 11/14/2011

GENERAL NOTARY - STATE OF NEBRASKA
LINDA D. PARKS
My Comm. Exp. 11/14/2011

(This area for notarial seal)

When Recorded Return To: ASSIGNMENT PREP, AURORA LOAN SERVICES P.O. Box 1706, Scottsbluff, NE 69363-1706

"RFO*KFOALSI*12/02/2009 09:06:23 AM* ALSI01ALSIA00XXXXXXXXXXX0612079* COARAPA* 0021706007 COSTATE_TRUST_ASSIGN_ASSN **KFOALSI*

EXHIBIT
3

EXHIBIT 4

| | |
|---|---|
| Arapahoe County District Court<br>7325 South Potomac Street<br>Centennial, CO 80112 | |
| Petitioner: Aurora Loan Services LLC<br><br>vs<br><br>Respondents: Randy S. Goldenhersh, et al. | |
| Attorneys for Petitioner:<br>Toni M. N. Dale #30580<br>Holly L. Decker #32647<br>Dale & Decker, LLC<br>Attorneys at Law<br>2 Inverness Drive East, Suite 105<br>Englewood, CO 80112<br>Ph#720-493-4600; Fx#866-303-8293<br>mail@daledecker.com<br>File # 09-7186; Loan# 0021706007 | Civil No<br><br>Div No |

## VERIFIED MOTION FOR ORDER AUTHORIZING SALE

In the Matter of the Application of Aurora Loan Services LLC for an Order Authorizing Arapahoe County Public Trustee, State of Colorado, to sell certain real estate under a power of sale contained in a Deed of Trust.

1.      Petitioner is owner and holder of evidence of debt executed by Randy S. Goldenhersh dated July 14, 2006, in the original principal sum of $910,000.00. A copy of the evidence of debt is attached hereto as Exhibit 1. The evidence of debt is secured by a Deed of Trust dated July 14, 2006, recorded July 21, 2006, at Reception No. B6105611 in the records of Arapahoe County, Colorado (hereinafter referred to as the "Deed of Trust"). A copy of the Deed of Trust is attached hereto as Exhibit 2.

2.      The Deed of Trust contains a power of sale to the Public Trustee of said County; said indebtedness secured thereby is in default due to nonpayment; Petitioner is entitled to foreclose the Deed of Trust, and to have the real property described herein sold by Public Trustee pursuant to statute, because Respondent defaulted under the Deed of Trust by his failure to timely pay monthly installments due Petitioner.

3.      The real property is described as follows:

The N 1/2 of Tract 40, Clark Colony No. 3, Subdivision of Section 17, Township 5 South, Range 67 West, Except the Westerly 5 Feet Thereof, County of Arapahoe, State of Colorado.
alleged property address: 6500 East Prentice Avenue, Greenwood Village, CO 80111

4.      The names and last known addresses, as shown by the records of the moving party, of the grantors of such Deed of Trust, of the current record owner of the property to be

sold, and of any persons known or believed by the moving party to be personally liable upon the indebtedness secured by the Deed of Trust, as well as the names and addresses of those persons who appear to have acquired a record interest in such real property, subsequent to the recording of such Deed of Trust and prior to the recording of the Notice of Election and Demand for Sale, whether by deed, mortgage, judgment or any other instrument of record are as follows:

Randy S. Goldenhersh
6500 East Prentice Avenue
Greenwood Village, CO 80111

Randy S. Goldenhersh
6500 East Prentice Avenue
Englewood, CO 80111

First Bank of South Dakota (National Association)
Lien Perfection Dept.
PO Box 64778
St. Paul, MN 55164-0778

Webster Bank, N.A.
Webster Plaza
145 Bank Street
Waterbury, CT 06702

Webster Bank, N.A.
Attn: CH535
609 West Johnson Avenue
Cheshire, CT 06410-4502

5. Petitioner, through its undersigned counsel, represents to this Court, upon information and belief, that the debtor(s) are not in the military service or entitled to the protections afforded under the Servicemembers Civil Relief Act of 2003 based upon a search conducted on www.servicememberscivilreliefact.com. A copy of the search result(s) which provide that there was no record found that the individual(s) is/are in active service is/are attached as Exhibit 3.

6. Venue for this proceeding is proper pursuant to C.R.C.P. 120(f) as this proceeding involves a consumer obligation being brought in the County in which the property is located.

WHEREFORE, Petitioner moves for an Order Authorizing a Public Trustee's Sale under the power contained in the Deed of Trust.

Dated: April 12, 2010

Toni M./N. Dale #30580
Holly L. Decker #32647

Pursuant to the Fair Debt Collection Practices Act, this law firm is deemed to be a debt collector attempting to collect a debt and any information obtained will be used for that purpose.

Address of Petitioner:
10350 Park Meadows Drive
Littleton, CO 80124

State of Colorado        )
                         ) ss
County of Arapahoe       )

     The undersigned attorney for the above named Petitioner hereby certifies that she has read the above and foregoing Motion, and that all the statements made therein are true and correct to the best of her knowledge, information and belief.

                                                Toni M. N. Dale #30580
                                                Holly L. Decker #32647

     SUBSCRIBED AND SWORN before me this _12th_ day of _April_, 20_10_, in the county of Arapahoe, State of Colorado.

My commission expires: _7/27/11_                            
                                     Notary Public

MELISSA K. BARELA
Notary Public
State of Colorado
My Commission Expires July 27, 2011

Pursuant to the Fair Debt Collection Practices Act, this law firm is deemed to be a debt collector attempting to collect a debt and any information obtained will be used for that purpose.

*EXHIBIT '5*

## ADJUSTABLE RATE NOTE
### 5 Year Fixed Rate Payment Option

GOLDENBERSH
Loan #: 1001894811
MIN: 100058310000809766

THIS NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THIS NOTE.

| JULY 14, 2006 | GREENWOOD VILLAGE | COLORADO |
|---|---|---|
| [Date] | [City] | [State] |

6500 EAST PRENTICE AVENUE, GREENWOOD VILLAGE, CO 80111
[Property Address]

### 1. BORROWER'S PROMISE TO PAY

In return for a loan that I have received, I promise to pay U.S. $910,000.00 (this amount, including any increase to this amount under the terms of this Note, is called "Principal"), plus interest, to the order of Lender. The Principal amount may increase as provided in this Note, but can never exceed the maximum amount specified in Section 3(F) of this Note. Lender is LOANCITY , A CALIFORNIA CORPORATION. I will make all payments under this Note in the form of cash, check, or money order.

I understand that Lender may transfer this Note. Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder."

### 2. INTEREST

#### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of 7.000%. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of this Note.

#### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of AUGUST, 2011, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

#### (C) Interest Rate Limit

My interest rate will never be greater than 9.950%.

#### (D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable

**EXHIBIT**

tabbies

5

1001894811

information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-FOURTH percentage point(s) (2.250%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on SEPTEMBER 1, 2006. Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under this Note. Each monthly payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2036, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 5671 SANTA TERESA BOULEVARD, SUITE 100, SAN JOSE, CA 95123 or at a different place if required by the Note Holder.

#### (B) Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $3,655.02 until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under this Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

#### (C) Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of SEPTEMBER, 2011, and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

#### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments

5 YEAR FIXED RATE PAYMENT OPTION MULTISTATE ADJUSTABLE RATE NOTE 05/06
9796.5                                               Page 2 of 6

1001894811

the Note Holder may require under the Security Instrument (as defined in Section 11 of this Note, below).

### (E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal can never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

### (G) Required Full Payment

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my payment changes again.

### (H) Payment Options

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

    (i)    Interest Only Payment: the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

    (ii)    Fully Amortized Payment: the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

    (iii)    15 Year Amortized Payment: the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment.

### (I) Failure to Make Adjustments

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess

5 YEAR FIXED RATE PAYMENT OPTION MULTISTATE ADJUSTABLE RATE NOTE 05/06
9796.5                                                                Page 3 of 6

1001894811

monies that I may have paid to partial Prepayment of unpaid Principal.

## 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

## 5. BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

I may make a full Prepayment or partial Prepayments without paying any Prepayment charge. The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due dates of my monthly payments unless the Note Holder agrees in writing to those changes. My partial Prepayment may reduce the amount of my monthly payments after the first Payment Change Date following my partial Prepayment. However, any reduction due to my partial Prepayment may be offset by an interest rate increase.

## 6. LOAN CHARGES

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from me that exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the Principal I owe under this Note or by making a direct payment to me. If a refund reduces Principal, the reduction will be treated as a partial Prepayment.

## 7. BORROWER'S FAILURE TO PAY AS REQUIRED

### (A) Late Charges for Overdue Payments

If the Note Holder has not received at least the full amount of any Minimum Payment by the end of 15 calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be 5.000% of my overdue Minimum Payment. I will pay this late charge promptly but only once on each late payment.

### (B) Default

If I do not pay at least the full amount of each Minimum Payment on the date it is due, I will be in default.

### (C) Notice of Default

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of Principal that has not been paid and all the interest that I owe on that amount. That date must be at least 30 days after the date on which the notice is mailed to me or delivered by other means.

### (D) No Waiver By Note Holder

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

### (E) Payment of Note Holder's Costs and Expenses

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right

1001894811

to be paid back by me for all of its costs and expenses in enforcing this Note to the extent not prohibited by applicable law. These expenses include, for example, reasonable attorneys' fees.

## 8. GIVING OF NOTICES

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Unless the Note Holder requires a different method, any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

## 9. OBLIGATIONS OF PERSONS UNDER THIS NOTE

If more than one person signs this Note, each person is fully and personally obligated to keep all the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all the amounts owed under this Note.

## 10. WAIVERS

I and any other person who has obligations under this Note waive the rights of Presentment and Notice of Dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of Dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11. SECURED NOTE

In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust, or Security Deed (the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses that might result if I do not keep the promises that I make in this Note. That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note. Some of these conditions read as follows:

Transfer of the Property or a Beneficial Interest in Borrower. As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is

5 YEAR FIXED RATE PAYMENT OPTION MULTISTATE ADJUSTABLE RATE NOTE 05/06

PSYE

1001894811

given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

_Rury LRoodlee_ _07/14/06_
- BORROWER - RANDY S. GOLDENHERSH - DATE -

*[Sign Original Only]*

## PREPAYMENT FEE ADDENDUM TO NOTE

GOLDENHERSH
Loan #: 1001894811
MIN: 100058310000809766

This Prepayment Fee Addendum ("Addendum") is made this 14TH day of JULY, 2006, and is incorporated into and intended to form a part of the Note dated the same date as this Addendum and also amends and supplements the mortgage, deed of trust, security deed, or security instrument (the "Security Instrument") dated the same date as this Addendum and the Note. To the extent that the provisions of this Addendum are inconsistent with the provisions of the Note and/or the Security Instrument, the provisions of this Addendum shall prevail over and will supercede any such inconsistent provisions of the Note and/or the Security Instrument.

The section of the Note entitled BORROWER'S RIGHT TO PREPAY is amended to read in its entirety as follows:

### BORROWER'S RIGHT TO PREPAY

I have the right to make payments of Principal at any time before they are due. A payment of Principal only is known as a "Prepayment." When I make a Prepayment, I will tell the Note Holder in writing that I am doing so. I may not designate a payment as a Prepayment if I have not made all the monthly payments due under this Note.

The Note Holder will use my Prepayments to reduce the amount of Principal that I owe under this Note. However, the Note Holder may apply my Prepayment to the accrued and unpaid interest on the Prepayment amount, before applying my Prepayment to reduce the Principal amount of this Note. If I make a partial Prepayment, there will be no changes in the due date or in the amount of my monthly payment unless the Note Holder agrees in writing to those changes.

If I make a full Prepayment within THIRTY-SIX (36) months of the date of this Note, I agree to pay the Note Holder a Prepayment fee. The Prepayment fee I will pay shall be an amount equal to SIX (6) months advance interest on the amount of the Prepayment that, when added to all other amounts prepaid during the twelve (12) month period immediately preceding the date of the Prepayment, exceeds TWENTY percent (20.000%) of the original principal amount of this Note. I will not be obligated to pay a Prepayment fee if such a charge violates state or federal law.

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED

*[signature]*

- BORROWER - RANDY S. GOLDENHERSH - DATE -

DocuTech Form 6001 (CO Standard)
4181.12                                      Page 1 of 1                                     (Rev. 2/05)

Eᵡᴴᴵᴮᴵᵀ 6

744169211 8

111ᵈ

1ˢᵗ 744 169 2118
10815687

After Recording Return To:

6000 Greenwood Plaza Blvd., #200
Greenwood Village, CO 80111

Prepared By:
MERRY BRANNON
LOANCITY
4600 SOUTH ULSTER STREET,
SUITE 250
DENVER, CO 80237
(303) 539-7430

Arapahoe County Clerk & Recorder, Nancy A. Doty
Reception #: B6105611
Receipt #: 529011B         Recording Fee: $111.00
Pages Recorded: 22
Date Recorded: 7/21/2006 12:43:58 PM

DO 2M06007

1-22

[Space Above This Line For Recording Data]

## DEED OF TRUST

GOLDENHERSH
Loan #: 1001894821
PIN: 2075-17-1-03-014
MIN: 100058313000809766

### DEFINITIONS

Words used in multiple sections of this document are defined below and other words are defined in Sections 3, 11, 13, 18, 20 and 21. Certain rules regarding the usage of words used in this document are also provided in Section 16.

(A) "Security Instrument" means this document, which is dated JULY 14, 2006, together with all Riders to this document.

(B) "Borrower" is RANDY S. GOLDENHERSH. Borrower is the trustor under this Security Instrument.

(C) "Lender" is LOANCITY , A CALIFORNIA CORPORATION. Lender is a CORPORATION organized and existing under the laws of CALIFORNIA. Lender's address is 5671 SANTA TERESA BOULEVARD, SUITE 100, SAN JOSE, CA 95123.

(D) "Trustee" is the Public Trustee of ARAPAHOE County, Colorado.

(E) "MERS" is Mortgage Electronic Registration Systems, Inc. MERS is a separate corporation that is acting solely as a nominee for Lender and Lender's successors and assigns. MERS is the beneficiary under this Security Instrument. MERS is organized and existing under the laws of Delaware, and has an address and telephone number of P.O. Box 2026, Flint, MI 48501-2026, tel. (888) 679-MERS.

(F) "Note" means the promissory note signed by Borrower and dated JULY 14, 2006. The Note states that Borrower owes Lender NINE HUNDRED TEN THOUSAND AND 00/100 Dollars (U.S. $910,000.00) plus interest. Borrower has promised to pay this debt in regular Periodic Payments and to pay the debt in full not later than AUGUST 1, 2036.

(G) "Property" means the property that is described below under the heading "Transfer of Rights in the Property."

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
⇔    313                                        Page 1 of 14                                        Form 3006 1/01

CERTIFIED TO BE A FULL, TRUE, AND CORRECT COPY OF THE RECORDED DOCUMENT IN MY CUSTODY. DATE MAR 31 2009 BY _____ NANCY A. DOTY, ARAPAHOE COUNTY CLERK & RECORDER



EXHIBIT
6

1001894811

(H) **"Loan"** means the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this Security Instrument, plus interest.

(I) **"Riders"** means all Riders to this Security Instrument that are executed by Borrower. The following Riders are to be executed by Borrower [check box as applicable]:

☒ Adjustable Rate Rider      ☐ Condominium Rider      ☐ Second Home Rider
☐ Balloon Rider      ☒ Planned Unit Development Rider      ☐ Biweekly Payment Rider
☐ 1-4 Family Rider      ☐ Other(s) [specify]

(J) **"Applicable Law"** means all controlling applicable federal, state and local statutes, regulations, ordinances and administrative rules and orders (that have the effect of law) as well as all applicable final, non-appealable judicial opinions.

(K) **"Community Association Dues, Fees, and Assessments"** means all dues, fees, assessments and other charges that are imposed on Borrower or the Property by a condominium association, homeowners association or similar organization.

(L) **"Electronic Funds Transfer"** means any transfer of funds, other than a transaction originated by check, draft, or similar paper instrument, which is initiated through an electronic terminal, telephonic instrument, computer, or magnetic tape so as to order, instruct, or authorize a financial institution to debit or credit an account. Such term includes, but is not limited to, point-of-sale transfers, automated teller machine transactions, transfers initiated by telephone, wire transfers, and automated clearinghouse transfers.

(M) **"Escrow Items"** means those items that are described in Section 3.

(N) **"Miscellaneous Proceeds"** means any compensation, settlement, award of damages, or proceeds paid by any third party (other than insurance proceeds paid under the coverages described in Section 5) for: (i) damage to, or destruction of, the Property; (ii) condemnation or other taking of all or any part of the Property; (iii) conveyance in lieu of condemnation; or (iv) misrepresentations of, or omissions as to, the value and/or condition of the Property.

(O) **"Mortgage Insurance"** means insurance protecting Lender against the nonpayment of, or default on, the Loan.

(P) **"Periodic Payment"** means the regularly scheduled amount due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument.

(Q) **"RESPA"** means the Real Estate Settlement Procedures Act (12 U.S.C. Section 2601 et seq.) and its implementing regulation, Regulation X (24 C.F.R. Part 3500), as they might be amended from time to time, or any additional or successor legislation or regulation that governs the same subject matter. As used in this Security Instrument, "RESPA" refers to all requirements and restrictions that are imposed in regard to a "federally related mortgage loan" even if the Loan does not qualify as a "federally related mortgage loan" under RESPA.

(R) **"Successor in Interest of Borrower"** means any party that has taken title to the Property, whether or not that party has assumed Borrower's obligations under the Note and/or this Security Instrument.

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

μΦ

100189‹811

## TRANSFER OF RIGHTS IN THE PROPERTY

The beneficiary of this Security Instrument is MERS (solely as nominee for Lender and Lender's successors and assigns) and the successors and assigns of MERS. This Security Instrument secures to Lender: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this Security Instrument and the Note. For this purpose, Borrower, in consideration of the debt and the trust herein created, irrevocably grants and conveys to Trustee, in trust, with power of sale, the following described property located in the **COUNTY** (Type of Recording Jurisdiction) of **ARAPAHOE**: (Name of Recording Jurisdiction)
**THE N 1/2 OF TRACT 40, CLARK COLONY NO. 3, SUBDIVISION OF SECTION 17, TOWNSHIP 5 SOUTH, RANGE 67 WEST, EXCEPT THE WESTERLY 5 FEET THEREOF, COUNTY OF ARAPAHOE, STATE OF COLORADO.**
which currently has the address of **6500 EAST PRENTICE AVENUE, GREENWOOD VILLAGE**, Colorado **80111** ("Property Address").

TOGETHER WITH all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property." Borrower understands and agrees that MERS holds only legal title to the interests granted by Borrower in this Security Instrument, but, if necessary to comply with law or custom, MERS (as nominee for Lender and Lender's successors and assigns) has the right: to exercise any or all of those interests, including, but not limited to, the right to foreclose and sell the Property; and to take any action required of Lender including, but not limited to, releasing and canceling this Security Instrument.

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record and liens for taxes for the current year not yet due and payable.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. **Payment of Principal, Interest, Escrow Items, Prepayment Charges, and Late Charges.** Borrower shall pay when due the principal of, and interest on, the debt evidenced by the Note and any prepayment charges and late charges due under the Note. Borrower shall also pay funds for Escrow Items pursuant to Section 3. Payments due under the Note and this Security Instrument shall be made in U.S. currency. However, if any check or other instrument received by Lender as payment under the Note or this Security Instrument is returned to Lender unpaid, Lender may require that any or all subsequent payments due under the Note and this Security Instrument be made in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality, or entity; or (d) Electronic Funds Transfer.
   Payments are deemed received by Lender when received at the location designated in the Note or at such other location as may be designated by Lender in accordance with the notice provisions in Section 15. Lender may return any payment or partial payment if the payment or partial payments are insufficient to bring the Loan current. Lender may accept any payment or partial payment insufficient to bring the Loan

1001894811

current, without waiver of any rights hereunder or prejudice to its rights to refuse such payment or partial payments in the future, but Lender is not obligated to apply such payments at the time such payments are accepted. If each Periodic Payment is applied as of its scheduled due date, then Lender need not pay interest on unapplied funds. Lender may hold such unapplied funds until Borrower makes payment to bring the Loan current. If Borrower does not do so within a reasonable period of time, Lender shall either apply such funds or return them to Borrower. If not applied earlier, such funds will be applied to the outstanding principal balance under the Note immediately prior to foreclosure. No offset or claim which Borrower might have now or in the future against Lender shall relieve Borrower from making payments due under the Note and this Security Instrument or performing the covenants and agreements secured by this Security Instrument.

   **2. Application of Payments or Proceeds.** Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3. Such payments shall be applied to each Periodic Payment in the order in which it became due. Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.
   If Lender receives a payment from Borrower for a delinquent Periodic Payment which includes a sufficient amount to pay any late charge due, the payment may be applied to the delinquent payment and the late charge. If more than one Periodic Payment is outstanding, Lender may apply any payment received from Borrower to the repayment of the Periodic Payments if, and to the extent that, each payment can be paid in full. To the extent that any excess exists after the payment is applied to the full payment of one or more Periodic Payments, such excess may be applied to any late charges due. Voluntary prepayments shall be applied first to any prepayment charges and then as described in the Note.
   Any application of payments, insurance proceeds, or Miscellaneous Proceeds to principal due under the Note shall not extend or postpone the due date, or change the amount, of the Periodic Payments.

   **3. Funds for Escrow Items.** Borrower shall pay to Lender on the day Periodic Payments are due under the Note, until the Note is paid in full, a sum (the "Funds") to provide for payment of amounts due for: (a) taxes and assessments and other items which can attain priority over this Security Instrument as a lien or encumbrance on the Property; (b) leasehold payments or ground rents on the Property, if any; (c) premiums for any and all insurance required by Lender under Section 5; and (d) Mortgage Insurance premiums, if any, or any sums payable by Borrower to Lender in lieu of the payment of Mortgage Insurance premiums in accordance with the provisions of Section 10. These items are called "Escrow Items." At origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and assessments shall be an Escrow Item. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this Section. Borrower shall pay Lender the Funds for Escrow Items unless Lender waives Borrower's obligation to pay the Funds for any or all Escrow Items. Lender may waive Borrower's obligation to pay to Lender Funds for any or all Escrow Items at any time. Any such waiver may only be in writing. In the event of such waiver, Borrower shall pay directly, when and where payable, the amounts due for any Escrow Items for which payment of Funds has been waived by Lender and, if Lender requires, shall furnish to Lender receipts evidencing such payment within such time period as Lender may require. Borrower's obligation to make such payments and to provide receipts shall for all purposes be deemed to be a covenant and agreement contained in this Security Instrument, as the phrase "covenant and agreement" is used in Section 9. If Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may exercise its rights under Section 9 and pay such amount and Borrower shall then be obligated under Section 9 to repay to Lender any such amount. Lender may revoke the waiver as to any or all Escrow Items at any time by a notice given in accordance with Section 15 and, upon such revocation, Borrower shall pay to Lender all Funds, and in such amounts, that are then required under this Section 3.
   Lender may, at any time, collect and hold Funds in an amount (a) sufficient to permit Lender to apply the Funds at the time specified under RESPA, and (b) not to exceed the maximum amount a lender can

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

1001894811

require under RESPA. Lender shall estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with Applicable Law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is an institution whose deposits are so insured) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items no later than the time specified under RESPA. Lender shall not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and Applicable Law permits Lender to make such a charge. Unless an agreement is made in writing or Applicable Law requires interest to be paid on the Funds, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender can agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds as required by RESPA.

If there is a surplus of Funds held in escrow, as defined under RESPA, Lender shall account to Borrower for the excess funds in accordance with RESPA. If there is a shortage of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the shortage in accordance with RESPA, but in no more than 12 monthly payments. If there is a deficiency of Funds held in escrow, as defined under RESPA, Lender shall notify Borrower as required by RESPA, and Borrower shall pay to Lender the amount necessary to make up the deficiency in accordance with RESPA, but in no more than 12 monthly payments.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender.

4. **Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

Lender may require Borrower to pay a one-time charge for a real estate tax verification and/or reporting service used by Lender in connection with this Loan.

5. **Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the

1001994811

Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

    If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

    All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

    In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

    If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

    **6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control.

COLORADO-Single Family-Fannie Mac/Freddie Mac UNIFORM INSTRUMENT
    313                                  Page 6 of 14                              Form 3006 1/01

1001894611

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Whether or not Borrower is residing in the Property, Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to, or the taking of, the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Mortgage Insurance.** If Lender required Mortgage Insurance as a condition of making the

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
313                                      Page 7 of 14                                      Form 3006 1/01

1001894811

Loan, Borrower shall pay the premiums required to maintain the Mortgage Insurance in effect. If, for any reason, the Mortgage Insurance coverage required by Lender ceases to be available from the mortgage insurer that previously provided such insurance and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to obtain coverage substantially equivalent to the Mortgage Insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the Mortgage Insurance previously in effect, from an alternate mortgage insurer selected by Lender. If substantially equivalent Mortgage Insurance coverage is not available, Borrower shall continue to pay to Lender the amount of the separately designated payments that were due when the insurance coverage ceased to be in effect. Lender will accept, use and retain these payments as a non-refundable loss reserve in lieu of Mortgage Insurance. Such loss reserve shall be non-refundable, notwithstanding the fact that the Loan is ultimately paid in full, and Lender shall not be required to pay Borrower any interest or earnings on such loss reserve. Lender can no longer require loss reserve payments if Mortgage Insurance coverage (in the amount and for the period that Lender requires) provided by an insurer selected by Lender again becomes available, is obtained, and Lender requires separately designated payments toward the premiums for Mortgage Insurance. If Lender required Mortgage Insurance as a condition of making the Loan and Borrower was required to make separately designated payments toward the premiums for Mortgage Insurance, Borrower shall pay the premiums required to maintain Mortgage Insurance in effect, or to provide a non-refundable loss reserve, until Lender's requirement for Mortgage Insurance ends in accordance with any written agreement between Borrower and Lender providing for such termination or until termination is required by Applicable Law. Nothing in this Section 10 affects Borrower's obligation to pay interest at the rate provided in the Note.

Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower is not a party to the Mortgage Insurance.

Mortgage insurers evaluate their total risk on all such insurance in force from time to time, and may enter into agreements with other parties that share or modify their risk, or reduce losses. These agreements are on terms and conditions that are satisfactory to the mortgage insurer and the other party (or parties) to these agreements. These agreements may require the mortgage insurer to make payments using any source of funds that the mortgage insurer may have available (which may include funds obtained from Mortgage Insurance premiums).

As a result of these agreements, Lender, any purchaser of the Note, another insurer, any reinsurer, any other entity, or any affiliate of any of the foregoing, may receive (directly or indirectly) amounts that derive from (or might be characterized as) a portion of Borrower's payments for Mortgage Insurance, in exchange for sharing or modifying the mortgage insurer's risk, or reducing losses. If such agreement provides that an affiliate of Lender takes a share of the insurer's risk in exchange for a share of the premiums paid to the insurer, the arrangement is often termed "captive reinsurance." Further:

(a) Any such agreements will not affect the amounts that Borrower has agreed to pay for Mortgage Insurance, or any other terms of the Loan. Such agreements will not increase the amount Borrower will owe for Mortgage Insurance, and they will not entitle Borrower to any refund.

(b) Any such agreements will not affect the rights Borrower has - if any - with respect to the Mortgage Insurance under the Homeowners Protection Act of 1998 or any other law. These rights may include the right to receive certain disclosures, to request and obtain cancellation of the Mortgage Insurance, to have the Mortgage Insurance terminated automatically, and/or to receive a refund of any Mortgage Insurance premiums that were unearned at the time of such cancellation or termination.

11. Assignment of Miscellaneous Proceeds; Forfeiture. All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender. If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
313                                          Page 8 of 14                                          Form 3006 1/01

1001894811

payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 19, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

12. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

13. Joint and Several Liability; Co-signers; Successors and Assigns Bound. Borrower covenants

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
€₂    313                          Page 9 of 14                          Form 3006 1/01

1001894811

and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 18, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 20) and benefit the successors and assigns of Lender.

14. **Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. In regard to any other fees, the absence of express authority in this Security Instrument to charge a specific fee to Borrower shall not be construed as a prohibition on the charging of such fee. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge (whether or not a prepayment charge is provided for under the Note). Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

15. **Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

16. **Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such

1001894811

conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**17. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**18. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**19. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earliest of: (a) five days before sale of the Property pursuant to any power of sale contained in this Security Instrument; (b) such other period as Applicable Law might specify for the termination of Borrower's right to reinstate; or (c) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 18.

**20. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan

1001894811

Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

Neither Borrower nor Lender may commence, join, or be joined to any judicial action (as either an individual litigant or the member of a class) that arises from the other party's actions pursuant to this Security Instrument or that alleges that the other party has breached any provision of, or any duty owed by reason of, this Security Instrument, until such Borrower or Lender has notified the other party (with such notice given in compliance with the requirements of Section 15) of such alleged breach and afforded the other party hereto a reasonable period after the giving of such notice to take corrective action. If Applicable Law provides a time period which must elapse before certain action can be taken, that time period will be deemed to be reasonable for purposes of this paragraph. The notice of acceleration and opportunity to cure given to Borrower pursuant to Section 22 and the notice of acceleration given to Borrower pursuant to Section 18 shall be deemed to satisfy the notice and opportunity to take corrective action provisions of this Section 20.

21. Hazardous Substances. As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

22. Acceleration; Remedies. Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 18 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT

NL

1001894811

by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in the foreclosure proceeding the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 22, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender shall give written notice to Trustee of the occurrence of an event of default and of Lender's election to cause the Property to be sold. Lender shall mail a copy of the notice to Borrower as provided in Section 15. Trustee shall record a copy of the notice in the county in which the Property is located. Trustee shall publish a notice of sale for the time and in the manner provided by Applicable Law and shall mail copies of the notice of sale in the manner prescribed by Applicable Law to Borrower and to the other persons prescribed by Applicable Law. After the time required by Applicable Law, Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder for cash at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of any parcel of the Property by public announcement at the time and place of any previously scheduled sale. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's certificate describing the Property and the time the purchaser will be entitled to Trustee's deed. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to all expenses of the sale, including, but not limited to, reasonable Trustee's and attorneys' fees; (b) to all sums secured by this Security Instrument; and (c) any excess to the person or persons legally entitled to it.

23. Release. Upon payment of all sums secured by this Security Instrument, Lender shall request that Trustee release this Security Instrument and shall produce for Trustee, duly cancelled, all notes evidencing debts secured by this Security Instrument. Trustee shall release this Security Instrument without further inquiry or liability. Borrower shall pay any recordation costs and the statutory Trustee's fees.

24. Waiver of Homestead. Borrower waives all right of homestead exemption in the Property.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

*Randy S. Goldenhersh*          07/14/06
- BORROWER - RANDY S. GOLDENHERSH - DATE -

1001894811

[Space Below This Line For Acknowledgment]

State of Colorado )
County of Arapahoe )

The foregoing instrument was acknowledged before me this 7 - 14 - 06 _____ by
Bandy S. Goldenhersh _____

_____

Witness my hand and official seal.

_J Hannauer_
Notary Public

J. HARROWER
NOTARY PUBLIC
STATE OF COLORADO

My Commission Expires 5/30/09

_____ (Title or Rank)
_____ (Serial Number, if any)
My Commission Expires:

COLORADO-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
ɘ    313                     Page 14 of 14                     Form 3006 1/01

ı

## ADJUSTABLE RATE RIDER
## 5 Year Fixed Rate Payment Option

GOLDENHERSH
Loan #: 1001894811
MIN: 1000583100008097 66

THIS ADJUSTABLE RATE RIDER is made this 14TH day of JULY, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust, or Security Deed (the "Security Instrument") of the same date given by the undersigned ("Borrower") to secure Borrower's Adjustable Rate Note (the "Note") to LOANCITY , A CALIFORNIA CORPORATION ("Lender") of the same date and covering the property described in the Security Instrument and located at:

6500 EAST PRENTICE AVENUE, GREENWOOD VILLAGE, CO 80111
[Property Address]

THE NOTE CONTAINS PROVISIONS THAT WILL CHANGE THE INTEREST RATE AND THE MONTHLY PAYMENT. THERE MAY BE A LIMIT ON THE AMOUNT THAT THE MONTHLY PAYMENT CAN INCREASE OR DECREASE. THE PRINCIPAL AMOUNT TO REPAY COULD BE GREATER THAN THE AMOUNT ORIGINALLY BORROWED, BUT NOT MORE THAN THE LIMIT STATED IN THE NOTE.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

Lender or anyone who takes the Note by transfer and who is entitled to receive payments under the Note is called the "Note Holder."

### A. INTEREST RATE AND MONTHLY PAYMENT CHANGES

The Note provides for changes in the interest rate and the monthly payments, as follows:

### 2. INTEREST

5 YEAR PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 05/06
9797.4                     Page 1 of 6

µ#

1001894811

### (A) Interest Rate

Interest will be charged on unpaid Principal until the full amount of Principal has been paid. I will initially pay interest at a yearly rate of 7.000%. The interest rate I will pay may change.

The interest rate required by this Section 2 is the rate I will pay both before and after any default described in Section 7(B) of the Note.

### (B) Interest Rate Change Dates

The interest rate I will pay may change on the first day of AUGUST, 2011, and on that day every month thereafter. Each date on which my interest rate could change is called an "Interest Rate Change Date." The new rate of interest will become effective on each Interest Rate Change Date. Although the interest rate may change monthly, my monthly payment will be recalculated in accordance with Section 3.

### (C) Interest Rate Limit

My interest rate will never be greater than 9.950%.

### (D) Index

Beginning with the first Interest Rate Change Date, my adjustable interest rate will be based on an Index. The "Index" is the "Twelve-Month Average" of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (h.15)" (the "Monthly Yields"). The Twelve Month Average is determined by adding together the Monthly Yields for the most recently available twelve months and dividing by 12. The most recent Index figure available as of the date 15 days before each Interest Rate Change Date is called the "Current Index."

If the Index is no longer available, the Note Holder will choose a new index that is based upon comparable information. The Note Holder will give me notice of this choice.

### (E) Calculation of Interest Rate Changes

Before each Interest Rate Change Date, the Note Holder will calculate my new interest rate by adding TWO AND ONE-FOURTH percentage point(s) (2.250%) to the Current Index. The Note Holder will then round the result of this addition to the nearest one-eighth of one percentage point (0.125%). Subject to the limit stated in Section 2(C) above, the result of this addition will be my new interest rate until the next Interest Rate Change Date.

### 3. PAYMENTS

#### (A) Time and Place of Payments

I will make a payment every month.

I will make my monthly payments on the first day of each month beginning on SEPTEMBER 1, 2006. Each of these dates is called a "Payment Due Date." I will make these payments every month until I have paid all the Principal and interest and any other charges that I may owe under the Note. Each monthly

1001894811

payment will be applied as of its scheduled due date and will be applied to interest before Principal. If, on AUGUST 1, 2036, I still owe amounts under the Note, I will pay those amounts in full on that date, which is called the "Maturity Date."

I will make my monthly payments at 5671 SANTA TERESA BOULEVARD, SUITE 100, SAN JOSE, CA 95123 or at a different place if required by the Note Holder.

#### (B) Minimum Payment; Amount of My Initial Monthly Payments

My "Minimum Payment" is the minimum amount the Note Holder will accept for my monthly payment, which the Note Holder will determine in accordance with this Section 3(B), or Section 3(D), 3(F) or 3(G), below, as applicable.

Each of my initial Minimum Payments will be in the amount of U.S. $3,655.02, until a new Minimum Payment is required as provided below. If my Minimum Payment is not sufficient to cover the interest due under the Note, the difference will be added to my Principal amount as provided in Section 3(E) below. My initial Minimum Payment may not be sufficient to cover the interest due.

#### (C) Payment Change Dates

My Minimum Payment may change as required by Section 3(D) below beginning on the first day of SEPTEMBER, 2011, and on that day every 12th month thereafter through my 109th Payment Due Date. Beginning with my 121st Payment Due Date, my Minimum Payment may change monthly thereafter. Each of these dates is called a "Payment Change Date." My Minimum Payment also will change at any time Section 3(F) or 3(G) below requires me to pay a different amount.

I will pay at least the amount of my new Minimum Payment each month beginning on each Payment Change Date or as provided in Section 3(F) or 3(G) below.

#### (D) Calculation of Monthly Payment Changes

Before each Payment Change Date, the Note Holder will calculate the amount of the monthly payment that would be sufficient to repay the unpaid Principal that I am expected to owe at the Payment Change Date in full on the Maturity Date in substantially equal installments at the interest rate effective during the month preceding the Payment Change Date. The result of this calculation is called the "Full Payment." For the Payment Change Dates occurring on the 61st, 73rd, 85th, 97th, and 109th Payment Due Dates, the Note Holder also will multiply the amount of my last Minimum Payment due before the Payment Change Date by the number 1.075. The result of this calculation is called the "Limited Payment." Unless Section 3(F) below requires me to pay a different amount, the amount of my new Minimum Payment that will be effective on each of the 61st, 73rd, 85th, 97th, and 109th Payment Change Dates will be the lesser of the Full Payment or the Limited Payment. The amount of my new Minimum Payment that will be effective on each of the Payment Change Dates beginning with the 121st Payment Due Date and continuing monthly thereafter will be the Full Payment, as provided in Section 3(G) below.

The Minimum Payment applies only to the Principal and interest payment and does not apply to any escrow payments the Note Holder may require under the Security Instrument.

#### (E) Additions to My Unpaid Principal

My monthly payment could be less than or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid Principal I owe at the monthly payment date in

5 YEAR PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 05/06
9797.4                                        Page 3 of 6

1001894811

full on the Maturity Date in substantially equal payments. For each month that my monthly payment is less than the interest portion, the Note Holder will subtract the amount of my monthly payment from the amount of the interest portion and will add the difference to my unpaid Principal. The Note Holder also will add interest on the amount of this difference to my unpaid Principal each month. The interest rate on the interest added to Principal will be the rate required by Section 2 above. For each month that my monthly payment is greater than the interest portion, the Note Holder will apply the payment as provided in Section 3(A).

### (F) Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid Principal may never exceed a maximum amount equal to 115% of the Principal amount I originally borrowed. Because of my paying only limited monthly payments, the addition of unpaid interest to my unpaid Principal under Section 3(E) above could cause my unpaid Principal to exceed that maximum amount. In that event and unless Section 3(G) requires me to pay a different amount, on the Payment Due Date that my paying my monthly payment would cause me to exceed that limit and continuing each monthly Payment Due Date thereafter through the 120th Payment Due Date, I will instead pay a new monthly payment in an amount not less than the amount that would pay the interest portion of the monthly payment at the interest rate effective during the month preceding the applicable Payment Due Date. This amount will be my new Minimum Payment. This means that my Minimum Payment may change monthly. This method of calculating my new Minimum Payment amount will remain in effect until the 121st Payment Due Date.

### (G) Required Full Payment

Beginning on the Payment Change Date that occurs on the 121st Payment Due Date and continuing monthly thereafter, I will pay the Full Payment as my Minimum Payment until my monthly payment changes again.

### (H) Payment Options

Each month the Note Holder may provide me with up to three additional payment options (in addition to the Minimum Payment) that are equal to or greater than the Minimum Payment, which are called "Payment Options." I may be given the following Payment Options:

(i)   **Interest Only Payment:** the amount that would pay the interest portion of the monthly payment at the current interest rate. The Principal balance will not be decreased by this Payment Option. This payment option will not be available beginning with the 121st Payment Due Date.

(ii)  **Fully Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) on the Maturity Date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current interest rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

(iii) **15 Year Amortized Payment:** the amount necessary to pay the loan off (including all Principal and interest) within a fifteen (15) year period from the first payment due date in substantially equal installments at the interest rate effective during the preceding month. This Payment Option is calculated on the assumption that the current rate will remain in effect until the loan is paid in full, however, the current interest rate may in fact change in accordance with Section 2(B) above.

Payment Options will only be available if they are equal to or greater than the Minimum Payment.

1001954811

### (I) Failure to Make Adjustments

If for any reason the Note Holder fails to make an adjustment to the interest rate or payment amount as described herein, regardless of any notice requirement, I agree the Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold the Note Holder responsible for any damages to me that may result from the Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies that I may have paid to partial Prepayment of unpaid Principal.

### 4. NOTICE OF CHANGES

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given to me and also the title and telephone number of a person who will answer any question I may have regarding the notice.

### B. TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER

Uniform Covenant 18 of the Security Instrument is amended to read as follows:

**Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 18, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law. Lender also shall not exercise this option if: (a) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (b) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument is acceptable to Lender.

To the extent permitted by Applicable Law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption. Lender also may require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender releases Borrower in writing.

If Lender exercises the option to require immediate payment in full, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 15 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies

5 YEAR PAYMENT OPTION MULTISTATE ADJUSTABLE RATE RIDER 05/06

1001894811

permitted by this Security Instrument without further notice or demand on Borrower.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider.

- BORROWER - RANDY S. GOLDENHERSH - DATE -

# PLANNED UNIT DEVELOPMENT RIDER

GOLDENHER SH
Loan #: 1001894811
MIN: 100058910000809766

THIS PLANNED UNIT DEVELOPMENT RIDER is made this 14TH day of JULY, 2006, and is incorporated into and shall be deemed to amend and supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the same date, given by the undersigned (the "Borrower") to secure Borrower's Note to LOANCITY , A CALIFORNIA CORPORATION, (the "Lender") of the same date and covering the Property described in the Security Instrument and located at:

6500 EAST PRENTICE AVENUE, GREENWOOD VILLAGE, CO 80111

[Property Address]

The Property includes, but is not limited to, a parcel of land improved with a dwelling, together with other such parcels and certain common areas and facilities, as described in THE COVENANTS, CONDITIONS AND RESTRICTIONS FILED OF RECORD THAT AFFECT THE PROPERTY (the "Declaration"). The Property is a part of a planned unit development known as

CLARK COLONY

[Name of Planned Unit Development]

(the "PUD"). The Property also includes Borrower's interest in the homeowners association or equivalent entity owning or managing the common areas and facilities of the PUD (the "Owners Association") and the uses, benefits and proceeds of Borrower's interest.

PUD COVENANTS. In addition to the covenants and agreements made in the Security Instrument, Borrower and Lender further covenant and agree as follows:

A. PUD Obligations. Borrower shall perform all of Borrower's obligations under the PUD's Constituent Documents. The "Constituents Documents" are the: (i) Declaration; (ii) articles of incorporation, trust instrument or any equivalent document which creates the Owners Association; and (iii) any by-laws or other rules or regulations of the Owners Association. Borrower shall promptly pay, when due, all dues and assessments imposed pursuant to the Constituent Documents.

B. Property Insurance. So long as the Owners Association maintains, with a generally accepted insurance carrier, a "master" or "blanket" policy insuring the Property which is satisfactory to Lender and which provides insurance coverage in the amounts (including deductible levels), for the periods, and against loss by fire, hazards included within the term "extended coverage," and any other hazards, including, but not limited to, earthquakes and floods, for which Lender requires insurance, then: (i) Lender waives the

MULTISTATE PUD RIDER - Single Family - Fannie Mae/Freddie Mac UNIFORM INSTRUMENT
34.23                                    Page 1 of 2                                    Form 3150 1/01

1001854811

provision in Section 3 for the Periodic Payment to Lender of the yearly premium installments for property insurance on the Property; and (ii) Borrower's obligation under Section 5 to maintain property insurance coverage on the Property is deemed satisfied to the extent that the required coverage is provided by the Owners Association policy.

What Lender requires as a condition of this waiver can change during the term of the loan.

Borrower shall give Lender prompt notice of any lapse in required property insurance coverage provided by the master or blanket policy.

In the event of a distribution of hazard insurance proceeds in lieu of restoration or repair following a loss to the Property, or to common areas and facilities of the PUD, any proceeds payable to Borrower are hereby assigned and shall be paid to Lender. Lender shall apply the proceeds to the sums secured by the Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

C. Public Liability Insurance. Borrower shall take such actions as may be reasonable to insure that the Owners Association maintains a public liability insurance policy acceptable in form, amount, and extent of coverage to Lender.

D. Condemnation. The proceeds of any award or claim for damages, direct or consequential, payable to Borrower in connection with any condemnation or other taking of all or any part of the Property or the common areas and facilities of the PUD, or for any conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender. Such proceeds shall be applied by Lender to the sums secured by the Security Instrument as provided in Section 11.

E. Lender's Prior Consent. Borrower shall not, except after notice to Lender and with Lender's prior written consent, either partition or subdivide the Property or consent to: (i) the abandonment or termination of the PUD, except for abandonment or termination required by law in the case of substantial destruction by fire or other casualty or in the case of a taking by condemnation or eminent domain; (ii) any amendment to any provision of the "Constituent Documents" if the provision is for the express benefit of Lender; (iii) termination of professional management and assumption of self-management of the Owners Association; or (iv) any action which would have the effect of rendering the public liability insurance coverage maintained by the Owners Association unacceptable to Lender.

F. Remedies. If Borrower does not pay PUD dues and assessments when due, then Lender may pay them. Any amounts disbursed by Lender under this paragraph F shall become additional debt of Borrower secured by the Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this PUD Rider.

_Racuy   A Leeleeleee_ 7/14/06
- BORROWER   RANDY S. GOLDENHERSH - DATE -

Arapahoe County Website - Parcel Search

Page 1 of 2

*EXHIBIT 7*



as of 9/23/2010

| Parcel #: | 2075-17-1-03-014 |
| Situs Address: | 6500 E. PRENTICE AVE. |
| Situs City: | GREENWOOD VILLAGE |

View Parcel Map

Residential Sales by Tax Year and Neighborhood

| Owner Name: | GOLDENHERSH, RANDY S |
| Co-Owner Name: | |
| Owner Address: | 6500 E. PRENTICE AVE. |
| City/State/Zip: | ENGLEWOOD, CO 80111-1607 |

| Neighborhood: | CLARK COLONY NO 3 SEC 17 5 67 |
| Neighborhood Code: | 0550 |
| Acreage: | 2.200 |
| Land Use: | IMPROVED RESIDENTIAL ACREAGE |
| Legal Desc: | N 1/2 TR 40 SEC 17-5-67 CLARK COLONY NO 3 |

| | Total | Building | Land |
|---|---|---|---|
| 2010 Appraised Value | 1,315,000 | 325,000 | 990,000 |
| 2010 Assessed Value | 104,670 | 25,870 | 78,800 |

**2009 Mill Levy:**

| Sale | Book | Page | Date | | | Price |
|---|---|---|---|---|---|---|
| | | | 12/01/2005 | SW | Other | 0 |
| | | | 03/01/1986 | WY | Joint Tenants | 165,000 |
| | | | 11/01/1985 | WY | Other | 220,000 |
| | | | 08/01/1985 | WY | Other | 226,500 |
| | | | 01/01/1985 | PT | Tenants In Common | 0 |
| | | | 07/01/1982 | WY | Other | 1 |

| Misc Impr | ID | Type | Line | Units | LenDia | WdtHgt | Qual | EcoLife |
|---|---|---|---|---|---|---|---|---|
| | 01 | R W OUT BSMT | 1 | 1 EA | 0 | 0 | 3 | 50 |
| | 02 | R ASPHALT DRV | 1 | 2500 SF | 0 | 0 | 3 | 20 |
| | 03 | R YARD IMPRV | 1 | 2 EA | 0 | 0 | 3 | 20 |
| | 04 | R EVAP CLR | 1 | 1 EA | 0 | 0 | 3 | 8 |
| | 05 | R SPKLR SYS-7 | 1 | 3000 UT | 0 | 0 | 3 | 15 |

| Buidling 01 | Quality Grade: | AVERAGE PLUS | Bedrooms: | 03 |

| Improvement Type: | SINGLE FAMILY RESIDENTIAL | Fireplaces: | 01 |
|---|---|---|---|
| Architectural: | RANCH | Air Conditioning: | N |
| Year Built: | 1972 | Range/Oven: | 00 |
| Roof Type: | GABLE | Disposal: | 01 |
| Roof Cover: | ASPHALT SHINGL | Compactor: | 00 |
| Heat Method: | HOT WATER STM | Dishwasher: | 01 |
| Heat Source: | NATURAL GAS | Bath 4 fixture: | 00 |
| Foundation: | CONCRETE | Bath 3 fixture: | 04 |
| Interior 1: | SUB FLOORING | Bath 2 fixture: | 01 |
| Interior 2: | DRYWALL | Extra fixtures: | 01 |

| Sections | Bld | Sec | Section Type | SqFt | Sty | Wall Type | Bsmt/ Finish |
|---|---|---|---|---|---|---|---|
| | 01 | 01 | BASIC SECTION | 2656 | 1.00 | FRAME,WOOD | 27/80 |
| | | 02 | ATTACHED GARGE | 809 | 1.00 | FRAME,WOOD | 0/0 |
| | | 03 | TERRACE | 68 | 1.00 | | 0/0 |
| | | 04 | WOOD BALCONY | 374 | 1.00 | | 0/0 |

Total Living Area: 2656

| Abatements | Log Number | Tax Year |
|---|---|---|
| | 70015000 | 2004 |
| | 70015000 | 2004 |
| | 90658000 | 2008 |
| | 90658000 | 2008 |
| | 90658000 | 2008 |

\* Not all parcels have available photos / sketches.

In some cases a sketch may be difficult to read. Please contact the Assessors Office for assistance. Measurements taken from the exterior of the building.

The Arapahoe County Assessors Office does not warranty the accuracy of any sketch, nor assumes any responsibility or liability to any user.

Although some parcels may have multiple buildings and photos, at this time our system is limited to 1 sketch and 1 photo per parcel number. Sorry for any inconvenience.



View Parcel Map

$E$ XHIBIT 8

This document constitutes a ruling of the court and should be treated as such.

**Court:** CO Arapahoe County District Court 18th JD

**Judge:** Charles M Pratt

**File & Serve
Transaction ID:** 27759318

**Current Date:** Nov 23, 2009

**Case Number:** 2009CV205048

**Case Name:** AURORA LOAN SERVICES LLC vs. GOLDENHERSH, RANDY S

**Court Authorizer
Comments:**

The issue raised by the defendant does not address the issues properly before the Court under Rule 120. If he wants to raise such it should be done in regular civil action.

**/s/ Judge Charles M Pratt**



| GRANTED WITH AMENDMENTS | The moving party is hereby ORDERED to provide a copy of this Order to any pro se parties who have entered an appearance in this action within 10 days from the date of this order. | *[signature]* **Charles M. Pratt** **District Court Judge** DATE OF ORDER INDICATED ON ATTACHMENT |

| | |
|---|---|
| Arapahoe County District Court 7325 South Potomac Street Centennial, CO 80112 | EFILED Document CO Arapahoe County District Court 18th JD Filing Date: Nov 23 2009 8:53AM MST Filing ID: 28173149 Review Clerk: N/A |
| Petitioner: Aurora Loan Services LLC | |
| vs | |
| Respondents: Randy S. Goldenhersh, et al. | |
| File # 09-7186 Loan# 0021706007 | Civil No. Public Trustee Sale # |

## ORDER AUTHORIZING SALE

THE COURT FINDS that there is a reasonable probability that the default or other circumstances alleged in the Verified Motion for Order Authorizing Sale to justify invocation of the power of sale has occurred, that an Order Authorizing Sale is otherwise proper under the Servicemembers Civil Relief Act of 2003, that the provisions of Rule 120 of the Rules of Civil Procedure have been complied with, that the hearing on the Motion was scheduled on November 23, 2009, that the provisions of C.R.C.P. 120 have been complied with and that the Motion should be granted.

IT IS ORDERED that the Public Trustee, pursuant to the provisions of the Deed of Trust dated July 14, 2006, recorded July 21, 2006, at Reception No. B6105611 in the records of Arapahoe County, Colorado is authorized to sell the following real property in Arapahoe County, Colorado and that a return of sale be made to this Court:

The N 1/2 of Tract 40, Clark Colony No. 3, Subdivision of Section 17, Township 5 South, Range 67 West, Except the Westerly 5 Feet Thereof, County of Arapahoe, State of Colorado.
alleged property address: 6500 East Prentice Avenue, Greenwood Village, CO 80111

Dated:_____                    BY THE COURT:

                                                    _____
                                                    Magistrate / District Court Judge

**EXHIBIT** 9